## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHAUNA J. BARNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  CIV-10-1266-F** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Shauna J. Barnett ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of Defendant Commissioner's final decision denying Plaintiff's application for supplemental security income payments under the Social Security Act.  This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B).  Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

## Administrative Proceedings

In 1995, Plaintiff  – then fifteen years old – was determined to be disabled due to a mental impairment which met the severity of Childhood Listing 112.04, 20 C.F.R, Part 404, Subpart P, Appendix 1 [Tr. 21 and 54 - 57].  In 1999, a new determination using adult supplemental security income criteria was required by law; upon application of that criteria, a Disability Hearing Officer found Plaintiff capable of performing unskilled work [Tr. 21,

23, and 446 - 456].  Plaintiff then requested a hearing before an ALJ [Tr. 459] who by decision of September, 2000, determined that Plaintiff was not disabled under adult supplemental security income regulations [Tr. 630 - 641].  Nonetheless, incorrect information was entered into the Social Security Administration's system, allowing Plaintiff to continue to receive benefits [Tr. 21 and 23].

When the case was next subject to routine review in 2004, the error was discovered and, following notice of a cessation of benefits and a determination by a Hearing Officer that Plaintiff was not disabled [Tr. 21, 23 - 24, and 646 - 668], Plaintiff requested a hearing before an ALJ, maintaining that she was disabled due to bipolar disorder  [Tr. 723 - 729].  A July, 2006 hearing [Tr. 860 - 893] was held and in her September, 2006 decision the ALJ found that Plaintiff retained the capacity to perform work existing in the national economy and, accordingly, was not disabled within the meaning of the Social Security Act [Tr. 21 - 29].  The Appeals Council of the Social Security Administration declined Plaintiff's request for review [Tr. 9 - 11], and Plaintiff subsequently sought review of the Commissioner's final decision in this court.

On judicial review, the undersigned recommended that the Commissioner's decision be reversed and the matter remanded due to the ALJ's failure to properly evaluate the medical source statement provided by Dr. Hasbrook, a treating physician [Tr. 913 - 923].  The recommendation was adopted by United States District Judge Stephen P. Friot [Tr. 911 - 912].  Following a remand order by the Appeals Council [Tr. 930], a June, 2010 hearing was held where Plaintiff, who was represented by a non-attorney representative, Plaintiff's

husband, and a vocational expert testified [Tr. 975 - 1002].  In her July, 2010 decision the

ALJ – the same ALJ who issued the decision in 2006 – once again found that Plaintiff

retained the capacity to perform work existing in the national economy and, accordingly, was

not disabled within the meaning of the Social Security Act [Tr. 897 - 909].  In response,

Plaintiff has, once again, sought review of the Commissioner's final decision in this court.

**Standard of Review**

This court is limited in its review of the Commissioner's final decision to a

determination of whether the Commissioner's factual findings are supported by substantial

evidence in the record and whether the correct legal standards were applied.  *Lax v. Astrue***,**

489 F.3d 1080, 1084 (10th Cir. 2007) (citations and quotations omitted).  Nonetheless, while

this court can neither reweigh the evidence nor substitute its own judgment for that of the

Commissioner, the court's review is not superficial.  "To find that the [Commissioner's]

decision is supported by substantial evidence, there must be sufficient relevant evidence in

the record that a reasonable person might deem adequate to support the ultimate conclusion."

*Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted).  "A decision is not

based on substantial evidence if it is overwhelmed by other evidence in the record or if there

is a mere scintilla of evidence supporting it."  *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C.§423(d)(1)(A).  The

Commissioner applies a five-step inquiry to determine whether a claimant is disabled.  *See*

20 C.F.R. §416.920(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir.

1988) (describing five steps in detail).  Under this sequential procedure, Plaintiff  bears the

initial burden of proving that she has one or more severe impairments.  20 C.F.R. § 416.912;

*Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  Then, if Plaintiff makes a prima facie

showing that she can no longer engage in prior work activity, the burden of proof shifts to

the Commissioner to show that Plaintiff retains the capacity to perform a different type of

work and that such a specific type of job exists in the national economy.  *Turner*, 754 F.2d

at 328; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).

## Plaintiff's Claims of Error

Plaintiff first maintains that "[t]he ALJ erred, as a matter of law, in failing to properly

evaluate the medical opinion evidence." [Doc. No. 24, p. 16].[1]  Next, it is Plaintiff's

contention that "[t]he ALJ's residual functional capacity assessment was legally flawed and

not supported by substantial evidence."  *Id.* at 26.  The third and final claim is that "[t]he

ALJ's findings at step five of the sequential evaluation were not supported by substantial

evidence."  *Id.* at 28.

## Analysis

The ALJ concluded that Plaintiff – thirty years old at the time of the 2010 decision

---

[1]Unless otherwise indicated, quotations in this report are reproduced verbatim.

with a limited education and past relevant work as a waitress and dishwasher [Tr. 908] – was severely impaired by mood disorder, depression, and personality disorder [Tr. 900]. The ALJ further concluded that despite these impairments, Plaintiff had the residual functional capacity ("RFC")[2] to perform a full range of work at all exertional levels[3] with certain non-exertional limitations: "The claimant requires work in relative isolation, such as work from home, with limited contact with the general public, coworkers, and supervisors. The claimant can understand, remember, and follow simple one and two-step instructions. The claimant is able to sustain concentration necessary for unskilled work." [Tr. 903].

In beginning her discussion of the evidence of record[4] that informed Plaintiff's RFC, the ALJ first noted Plaintiff's "longstanding history of mental health impairments. She had a dysfunctional childhood. At the age of fourteen, she required impatient care for stabilization for suicide ideation. The claimant has since been provided counseling and different regimens of psychotropic medications with variable results." [Tr. 903 - 904]. Consistent with the assumption by Plaintiff's representative at her administrative hearing that August 1, 2004, would "be the date we'd be going back to [Tr. 978]," the ALJ then turned

---

[2]Residual functional capacity ("RFC") "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 416.945(a)(1).

[3]Plaintiff complained of back pain during her testimony at the administrative hearing [Tr. 990] but asserts no claim of error with regard to the ALJ's assessment of her physical functional abilities.

[4]This record contains evidence dating from May 1992 [Tr. 341].

5

to the evidence generated beginning in 2004 and continuing through 2010.[5]

In February, 2004, Plaintiff saw Certified Physician Assistant Sarah Henderson for urinary difficulties [Tr. 809 - 811].  Plaintiff's prescriptions for Depakote[6] and Prozac[7] were refilled [Tr. 809], and no mental difficulties were noted on examination.  *Id.*  Plaintiff returned in early April, 2004 with complaints of sore throat and sinus pain [Tr. 806].  On psychiatric examination, she was found to be oriented x 3 with normal mood and affect; her Depakote and Prozac were again refilled [Tr. 807].

Also in April, 2004 and in conjunction with its review of Plaintiff's disability status, the Social Security Administration referred Plaintiff to Robert A. Danaher, Psy.D., for a

---

[5]Due to the unusual nature of this case and the resulting voluminous record, it bears repeating that on September 23, 2000, an ALJ determined that Plaintiff was not disabled [Tr. 630 - 638].  Judicial review of this decision was not sought by Plaintiff and it became final.  Nonetheless, because incorrect information was entered on the Social Security Administration's system, Plaintiff continued to receive payments in error [Tr. 897].  In January, 2004, Plaintiff was given notice that the Social Security Administration was beginning a regular review of her case to determine whether she remained disabled [Tr. 646 - 647].  The undersigned's review of the medical evidence reveals that few treatment notes – for routine medical concerns – were generated during the over three year period from the September, 2000 decision to the January, 2004 review notice [Tr. 732 - 734, 735, and 736 - 759].  These records establish that on medications prescribed by her primary care physician, Plaintiff's mental status examinations variously showed intact judgment and insight, orientation to time, place, and person, and no depression, anxiety, or agitation [Tr. 743, 746 - 747, 750, and 753].

[6]Depakote, or Valproic Acid, is used to treat seizures and manic episodes associated with bipolar disorder (manic-depressive disorder), as well as to prevent migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html

[7]Prozac "is used to treat depression . . . and panic attacks[.]"  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html

mental status examination [Tr. 760 - 766].   Plaintiff reported that she was given Lithium[8] when she was eleven and took that medication until she was placed on Depakote five years ago [Tr. 760]; abrupt and severe mood swings that are lessened when she takes her medications were likewise reported [Tr. 761].   When describing her history and symptoms, "[s]he essentially described erratic compliance though in more recent times, over the past six years, she has developed better insight into her mental health concerns and subsequently better compliance with medications." *Id*.  With respect to her work history, Plaintiff reported a three-month work attempt at a grocery store that proved too stressful; she also indicated problems with agitation and a short temper [Tr. 762].   On examination, Plaintiff evidenced difficulties with functional memory as well as with sustained attention and concentration [Tr. 763].   Dr. Danaher opined that Plaintiff was able to manage benefit payments in her own interest [Tr. 766].

Plaintiff returned to Certified Physician Assistant Henderson in May, 2004 complaining of a cold [Tr. 802]; she was well-oriented with normal mood and affect on mental examination [Tr. 803].   Plaintiff's next treatment of record was in August, 2004 at the Enid Counseling and Diagnostic Center, Inc. [Tr. 813 - 815, 823, and 824] where Plaintiff requested "a psychological evaluation to update her disability information." [Tr. 813].   She

---

[8]"Lithium is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods).  Lithium is in a class of medications called antimanic agents.  It works by decreasing abnormal activity in the brain."  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html

reported "longstanding beliefs of inadequacy and hopelessness" and that she was "currently under extreme stress due to marital discourse and separation." *Id.* The ALJ summarized the results of Plaintiff's assessment as follows:

> Emotional assessments were completed on August 19, 2004, and August 23, 2004. The claimant was found to have a personality disorder characterized by disturbance of mood. The claimant reported having panic attacks. The claimant was found upon examination to have fluctuation of mood, but no evidence of a thought disorder, psychotic signs, or paranoia. She showed signs of negative self-concept, lack of impulse control, and self-defeating attitude. Individual therapy was recommended in conjunction with psychotropic medication (Exhibit C11F). Accordingly, the claimant established outpatient care for her depressive order, not otherwise specified. The counseling notes reflect the claimant attended four appointments (Exhibit C12F).

[Tr. 904].

There is no evidence of Plaintiff's treatment by any medical source from September 9, 2004, when she was last seen at the Enid Counseling and Diagnostic Center, Inc. to develop an individualized treatment plan [Tr. 816] until February 4, 2005, when, as described by the ALJ, she presented to the psychiatrist whose opinions are at the center of the issues in this appeal:

> On February 4, 2005, the claimant established outpatient mental health care with Vivian Hasbrook, M.D. The claimant related she was advised it would help her Social Security case to have care through a mental health clinic and by a psychiatrist. Upon examination, the claimant was alert and oriented times four. Her mood was euthymic with congruent affect. Her thought processes were coherent and goal oriented. Intellectual functioning was estimated to be in the average range with good judgment, fair insight, and intact remote and recent memory. Dr. Hasbrook increased the dosage of the claimant's Depakote and continued her Prozac and Ambien (Exhibit C15F). In follow up on April 15, 2005, the claimant reported with the increase in her Depakote, she seemed to be handling the stressors of her children in a much calmer manner, but had decreased energy. Dr. Hasbrook continued to modify the Depakote

8

dosage and frequency with progressive improvement.  The claimant reported on September 2, 2005, her medications seemed to be working well and things had really balanced out well for her.  She related she had been doing a lot of work at her house getting things cleaned up and organized because they were looking to buy a new home.  On February 3, 2006, the claimant denied any type of depressive symptoms, anxiety, or paranoia (Exhibit C16F).  The claimant reported on August 11, 2006, she was pleased with her medications and was doing quite well.  She specified her husband had noticed an improvement in her crying.  Dr. Hasbrook explained to the claimant on October 6, 2006, "just because she has a bipolar diagnosis, it doesn't mean that she is not capable of working.  I feel that though she is going to have something maybe part time and maybe that isn't a food service and people service kind of job.  Of course, she's limited because she's in a very small community" (Exhibit C21F).

[Tr. 904].

There is no evidence of record indicating that Plaintiff returned to Dr. Hasbrook after her October 6, 2006, appointment; neither is there any evidence of any contact with any medical source for two years or until October 29, 2008 [Tr. 968].  According to a  Northwest Center for Behavioral Health (Alva) Release Summary signed by a counselor, Joseph D. Garrison, Plaintiff "attended seven counseling sessions in a roughly 5 month period between 10/29/08 at 3/2/09.  She attended one doctors session on 3/6/09 and did not return for counseling." *Id.*  Keith Russell, the doctor who examined Plaintiff on March 6, 2009, noted as follows:

Patient is seen in evaluation, per Joe, her counselor.  Patient states she is here for follow up of her Bi-Polar Disorder.  She states she was diagnosed as a child at, I believe, the Mayo Clinic, whereby she states That she was unable to move one of her legs.  Did not feel pain in that leg.  States that they even stuck a needle in that leg.  She did not feel pain and somewhere along the line she was diagnosed with Bi-Polar Disorder and states that she has been treated as such since that time.  The interview process was primarily aimed at determining if or if not she had manic episodes consistent with either Bi-Polar I or Bi-Polar

II Disorder.  I asked her in different ways to describe for me what her manic phases were like whenever she was on medication vs. whenever she was off medication and specifically whenever she is off medication, her manic phases, if one can even call them manic phases, are not at all consistent with either Bi-Polar I or Bi-Polar II Disorder.  They sound more like an occasional episode of a few hours of being angry or some regularly occurring episodes of a very good mood, whereby she is able to take care of her household chores and have fun with her kids.  And again, this lasts only for a day at the most and does not sound as though the pace of her activities would be at all consistent with anything manic or even hypomanic.  Hence, I do not think she has Bi-Polar Disorder.  Albeit, she is evaluated today and I believe that her symptoms are more consistent with Depressive Disorder NOS vs. Mood Disorder NOS.  There is are some issues of low self esteem in her life and also she is somewhat immature in her views on life.

[Tr. 969].  On Mental Status Exam, Dr. Russell found that Plaintiff was "alert, oriented, pleasant, engaging, bright affect, good mood.  Speech is normal.  Normal rate and goal directed.  Her attention and concentration are normal.  Her judgment and insight are intact.  No evidence of any drug or alcohol abuse.  Neither suicidal nor homicidal."  *Id.*

Plaintiff's final medical source contact of record comes over a year later when she presented to Dr. Cordry at the Northwest Center for Behavioral Health (Enid) for a psychiatric assessment [Tr. 966].[9]  Dr. Cordry assessed Mood Disorder NOS and Depression NOS and made the following findings:

This patient is a 30 year old female who has been interviewed a couple of times by Lynn Stillwell.  She has had a history of mood disorder, she has a child who is 16 and had toxemia during that pregnancy, has been married previously and reports her current relationship is happy and she claims to be

_____

[9]The record contains treatment notes from the Krablin Medical Clinic of Hennessey for the period from November, 2009 to January, 2010 [Tr. 958 - 964].  On examination, Plaintiff's orientation, memory, mood, and affect were found to be within normal limits [Tr. 958, 962, 963, and 964].

happy and well adjusted after her husband left for a year.  She has two children and states that the daughter is well adjusted and the son is fine.  She said she has some mood swings which she is calling "manic", but I think she tends to match her moods with those of a friend, she has a poor relationship with her mother, and tends to not socialize and just takes care of her home and her children, but claims to have no reason to ever hurt herself. At times does have hallucinations which consist of a wolf following her and she claims this is because of her American Indian heritage.  Today she talked a lot about the poor relationship between her and her mother and her mother sounds as if she is probably borderline.  She has been trying to help her grandmother who seems to be a maternal figure for her and is trying to get her into assisted living.  Her husband is a truck driver and they live in Hennessey.

In the past she has taken Depakote 500 ER twice a day, which was helpful for mood stabilization and migraine headache and has also taken Prozac 20 mg daily.  In interactions with her mother, re-hashing arguments with her mother, it seems she has now learned to set boundaries with her and is not associating with her until her mother can be appropriate when they interact.  She does have a good relationship with her grandmother and seems to have a good relationship with her husband.  She is not suicidal nor homicidal, is not hallucinating today, just has more stress and situational issues.

Mental status: Today, she is oriented to time, place. person and situation, she is cooperative, her mood and affect is mildly labile, she is not suicidal nor homicidal and is not currently hallucinating not delusional.  Cognitively, she is intact, abstracting is fair. Her memory is intact, 3 words in 3 minutes, and she is able to relate to us her history, past, present and intermediate.  Her flow of thoughts is goal directed and she has insight and judgment into her situation is fair.  She is not aggressive toward others and denies any type of substance abuse issues currently, she has no hallucinations which are command and has no suicidal not homicidal ideation.

*Id.*  Dr. Cordry's plan was to "re-start her medicines which she has taken in the past and which have been helpful for her[.]" [Tr. 967].

Following her review of the objective medical evidence, the ALJ began her discussion of the opinion evidence by noting the relevant findings of the State agency experts:

[A] State agency psychologist . . . prepared a mental residual functional

capacity assessment and found the claimant was markedly limited in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the general public.  The psychologist found the claimant can perform simple repetitive tasks, can relate only on a superficial basis, and can adapt to a work situation (Exhibit C14F). . . . [T]he findings of the psychologist are given substantial weight and consideration as consistent with the treating medical records as well as the overall evidence.  Accordingly, the same have been reflected in the determination of the claimant's residual functional capacity.

[Tr. 906].  The ALJ then turned to the opinion evidence provided by Dr. Hasbrook, Plaintiff's

psychiatrist:

One of the claimant's treating psychiatrists, Vivian Hasbrook, M.D., completed a mental medical source statement dated July 7, 2006.  Dr. Hasbrook found the claimant had seven areas of moderate limitation.  In particular, Dr. Hasbrook opined the claimant had moderate limitation in her ability to carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and, respond appropriately to changes in the work setting.  Dr. Hasbrook further explained:

> Most of her moderate limitations occur in dealing with people in authority, i.e., employers.  I cannot say that this has anything to do with her mental illness diagnosis or if it is more personality and desire driven (Exhibit C18F).

As directed upon remand, this statement by Dr. Hasbrook has been given close review and consideration.  As a treating provider, the findings of Dr. Hasbrook have been given particular weight and consideration as somewhat consistent with her contemporaneous treating medical records, especially concerning social and concentration limitations.  However, these limitations were given on a five-point scale with moderate limitation defined as "affects but does not preclude ability to perform basic work functions."  Dr. Hasbrook later specified "just because she has a bipolar diagnosis, it doesn't mean that she is not capable of working" (Exhibit C21F).  As such, these findings of social and

concentration limitations have been reconciled with the other evidence of record and have been incorporated into the determination of the claimant's residual functional capacity. The findings concerning performing activities within a schedule, maintaining attendance, and completing a normal workday and workweek have been given little weight or consideration as unsupported by the objective medical evidence or overall record.

[Tr. 907].

### ALJ's Failure to Properly Evaluate Medical Evidence (Time Frame)

As was previously referenced, consistent with the statement made by Plaintiff's representative at the most recent administrative hearing when asked by the ALJ about the operative onset of disability date [Tr. 978], the ALJ began her detailed review of the medical evidence beginning in 2004 [Tr. 904]. In this regard, Plaintiff asserts that the ALJ erred by failing to consider the December 7, 1999 [Tr. 597 - 600] medical source statement completed by Dr. Rawlings, a medical expert utilized by the ALJ who denied Plaintiff benefits in 2000 [Tr. 630 - 638]. In addition, in arguing that the opinions of Dr. Hasbrook, Plaintiff's treating psychiatrist, were supported by other evidence of record, Plaintiff cites [Doc. No. 24, p. 24] to evidence of record dating from as early as October 26, 1989, when Plaintiff was a ten year old adolescent [Tr. 97]. Finally, in this same vein, Plaintiff argues that "the ALJ's statement . . . that when compliant with her medications, [Plaintiff] improved and her mood stabilized was not entirely accurate." [Doc. No. 24, p. 23]. According to Plaintiff, "the evidence as a whole shows that although [Plaintiff's] various medications did provide some degree of relief, she also continued to experience very significant symptoms as shown by multiple

records from November 1993 through August 2006." *Id.*[10] By way of support, Plaintiff once again cites to pre-2004 evidence dating from 1993 to 1999. *Id.*

As a general matter, the ALJ stated that she had carefully considered the evidence in this matter [Tr. 898]. Not only is it customary "to take a lower tribunal at its word when it declares that it has considered a matter[,]" *Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005), but the ALJ's decision demonstrates her awareness of Plaintiff's "longstanding history of mental health impairments." [Tr. 903].

In specific support of her claim of error regarding the ALJ's failure to address a medical source statement completed by Dr. Rawlings[11] – a medical expert – in 1999, Plaintiff relies on the decision by the Tenth Circuit Court of Appeals in *Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004). There, the court reiterated the mandate of Social Security regulation that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R §§ 404.1527(d), 416.927(d). The court then explained the consideration and weight to be accorded the opinion of a treating physician and concluded that "even if a doctor's medical observations regarding a claimant's allegations of disability date from

---

[10]Contrary to Plaintiff's argument [Doc. No. 24, p. 23], the ALJ did *not* offer this as a rationale for according little weight to certain of Dr. Hasbrook's opinions [Tr. 907]. Moreover, there is no dispute that Plaintiff advised the consultative examining psychologist that she has achieved *improvement* of her mood swings through medication compliance [Tr. 760 - 761].

[11]Plaintiff's theory is that because Dr. Rawlings opined that Plaintiff had some of the same functional limitations found by Dr. Hasbrook but rejected by the ALJ, the ALJ erred by failing to discuss and evaluate Dr. Rawlings' medical opinions [Doc. No. 24, pp. 25 - 26, n. 12].

earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the ALJ." *Hamlin,* 365 F.3d at 1215.  Thus, the *Hamlin* court was concerned with an ALJ's rejection of opinions voiced by the claimant's long term treating physicians rather than, as in this case, with the *controverted*[12] opinion of a medical expert – an expert called by a different ALJ some ten years earlier – who had not examined Plaintiff, but had only reviewed her medical records in preparation for his testimony, *id.* at 1219.  Moreover, the ALJ in the present case met the *Hamlin* court's requirement by stating that she had considered the evidence of record – a record which includes medical opinions dating "from earlier, previously adjudicated periods," *id.* at 1215 – and by reflecting that consideration in her findings that Plaintiff had a longstanding history of mental impairments and had received "counseling and different regimens of psychotropic medications with variable results.  When the claimant is compliant with her medications, she has improvement and stabilization of her mood.  She has experienced emotional stressors due to marital discord and separation." [Tr. 903 - 904].[13] As required by *Hamlin* and taking the ALJ at her word, the ALJ properly considered Dr. Rawlings' opinions and all pre-2004 evidence "as relevant to [Plaintiff's] medical history."

---

[12]Dr. Smallwood, a State agency psychological consultant, completed a Mental Residual Functional Capacity Assessment in 1999 in which he found Plaintiff to have no restrictions apart from  marked limitations in understanding, remembering, and carrying out detailed instructions and in dealing with the general public [Tr. 427 J - 427 L].

[13]By contrast, the claimant in *Hamlin* suffered from progressive functional limitations. *Id.* at 1216 - 1219.

*Hamlin,* 365 F.3d at 1215.

### Dr. Hasbrook's Opinions

As detailed above, while according "particular weight and consideration" [Tr. 907] to the majority of the moderate limitations assessed by Dr. Hasbrook in her July, 2006 Mental Medical Source Statement [Tr. 856 - 859], the ALJ gave Dr. Hasbrook's opinions that Plaintiff had moderate limitations in "performing activities within a schedule, maintaining attendance, and completing a normal workday and workweek . . . little weight or consideration as unsupported by the objective medical evidence or overall record." [Tr. 907]. This is significant because the vocational expert testified that a claimant who was restricted by *all* of Dr. Hasbrook's moderate limitations would have "a career-ending problem." [Tr. 1000].

Plaintiff argues that "[t]he first problem with the ALJ's rejection of two of Dr. Hasbrook's moderate limitations lies in the ALJ's vague statement that the rejected opinions were 'unsupported by the objective medical evidence or overall record' without identifying any specific inconsistencies the ALJ was actually relied on." [Doc. No. 24, p. 20].  In support, Plaintiff relies on the Tenth Circuit's decisions in *Langley v. Barnhart,* 373 F.3d 1116, 1123 (10th Cir. 2004) and *Krauser v. Astrue,* 638 F.3d 1324, 1331 (10th Cir. 2011) for the proposition that it is not the role of the court to find support in the ALJ's decision but, rather, it is the job of the ALJ to clearly single out precise inconsistencies [Doc. No. 24, p. 20].

In a recent unpublished decision, the Tenth Circuit addressed the legal sufficiency of

a finding by an ALJ that the opinion of a therapist was inconsistent both with the evidence of record and the therapist's treatment notes. *Zaricor-Ritchie v. Astrue,* No. 11-5074, 2011 WL 6243216, at *1 (10th Cir. Dec. 15, 2011) (unpublished op.). There, the claimant, relying on *Krauser,* asserted that "the ALJ erred by not stating how [a medical source's] opinions differed from other substantial evidence in the record or her own treatment notes." *Id.* at *2. The court found no error, concluding that the ALJ discussed the other evidence of record and that none of it showed the limitations assessed by the therapist. *Id.*

Here, the ALJ likewise provided a detailed review of the limited medical evidence, including a thorough summary of Dr. Hasbrook's treatment notes [Tr. 904 - 905].[14] That evidence, along with the ALJ's summary of Plaintiff's subjective description of her daily activities [Tr. 905 - 906][15] and the reported stress she experienced working as a waitress and

---

[14]Contrary to Plaintiff's assertion that the ALJ failed to evaluate Dr. Hasbrook's assessed limitations under the legally relevant factors [Doc. No. 24, p. 24], the ALJ both noted that Dr. Hasbrook was a psychiatrist and documented the history of Plaintiff's treatment by the physician [Tr. 904].

[15]In this regard, the ALJ stated that

[t]he claimant currently lives with her husband and their fourteen-year-old daughter and nine-year-old son. Her grandmother is also temporarily living with them. The claimant's mother-in-law lives next door. The claimant testified she gets her children up and ready in the morning and feeds them breakfast. She takes them to their activities or school. Her son is going to a summer reading program and her daughter is going to basketball practice and doing summer track. The claimant testified that she is the one to take care of her children when they get sick. The claimant is able to drive, clean the house, do laundry, prepare meals, and shop in the grocery store.

(continued...)

in a busy store and around people she did not know, appears consistent with the moderate concentration and social limitations assessed by Dr. Hasbrook and adopted by the ALJ. None of it, however, appears to support the restrictions imposed by Dr. Hasbrook with regard to performing activities within a schedule, maintaining attendance, or completing a normal workday and workweek.  The ultimate issue in both *Langley* and *Krauser* was whether the ALJ's findings were sufficiently specific to allow the court to conduct a meaningful review of those findings.  *Langley,* 373 F.3d at 1123; *Krauser,* 638 F.3d at 1331. That test has clearly been satisfied here.

Plaintiff, however, maintains that "the ALJ failed to fully discuss evidence that convincingly showed [Dr. Hasbrook's] opinions to be well founded." [Doc. No. 24, p. 24]. She argues that "[i]n this regard and perhaps most importantly, the ALJ simply ignored the opinions of medical expert Dr. Rawlings indicating the same limitations as those offered by Dr. Hasbrook but rejected by the ALJ." *Id.*  The undersigned has previously concluded that the ALJ committed no error in failing to evaluate Dr. Rawlings' opinions from 1999 during a previously adjudicated period in this case and finds nothing in Plaintiff's repeated argument to alter that determination.  In this same vein, Plaintiff argues that "the educational and medical evidence contained multiple findings not mentioned by the ALJ indicating [Plaintiff's] problems with concentration, memory, persistence, motivation, distractibility,

---

[15](...continued)
[Tr. 906].

stress tolerance (often resulting in poor attendance),[16] virtually daily emotional problems, accepting responsibility, judgment, insight, persistence, frustration, and cognition over a period of approximately 13 years." *Id.*

The bulk of the evidence cited by Plaintiff to support her argument, *id.,* dates from 1993 to 1999 and, as has been determined, was properly considered by the ALJ with regard to the history of Plaintiff's mental impairments.  Of the six citations to evidence generated beginning in 2004, the first is to a single page of the results of an April, 2004 mental status examination by Dr. Danaher, the consultative examining psychologist.  *Id.* and Tr. 763. Although Plaintiff does not direct the court to any specifics contained on this page of the report, the undersigned's review reveals that Plaintiff had some difficulties with functional memory attention and concentration difficulties.   The ALJ, however, accommodated Plaintiff's limitations by restricting her to unskilled work requiring only one and two-step instructions [Tr. 903].

Next, Plaintiff directs the court to the first page of the report of Dr. Hall who conducted Plaintiff's consultative physical examination in July, 2004 [Doc. No. 24, p. 24, Tr. 788].  No objective medical findings are found on this page but, rather, Plaintiff's subjective reports of daily volatile mood swings and stress resulting in anger and depression. By way of example, Plaintiff reported becoming stressful and volatile at the end of the month "knowing the bills are due." [Tr. 788].  Not only does Plaintiff fail to suggest how this

---

[16]This appears to be Plaintiff's characterization rather than a statement by a medical source.

supports a moderate restriction in performing activities within a schedule, mainlining regular attendance, and in completing a normal workday and workweek, but the ALJ found Plaintiff's subjective complaints to be less than credible [Tr. 906], a finding which is unchallenged on appeal.

Plaintiff's next citations are to evidence [Doc. No. 24, p. 24, Tr. 813 - 814, Tr. 817, and Tr. 823] of psychological assessments conducted in August, 2004 which, contrary to Plaintiff's claim, were discussed by the ALJ [Tr. 904].  Once again, Plaintiff does not isolate any specifics on the pages she cites; the undersigned's review of the material shows that Plaintiff reported that she was "currently under extreme stress due to marital discourse and separation" and that her "symptoms and disorders results in her being unemployable." [Tr. 813].  She was found to be severely depressed with a high degree of anxiety and the examining psychologist reported her "mood states have a negative impact on her concentration abilities, thus she has difficulty keeping her mind on tasks." [Tr. 814].  It was also determined that "she may have difficulty controlling impulses, particularly in relation to anger management skills" and that "she likely exhibits a chronic pattern of alienation and isolation."  *Id.*  Once again, however, the ALJ acknowledged Plaintiff's concentration and social interaction issues in her RFC [Tr. 903].

Plaintiff's final general citation to the record is to Plaintiff's first appointment with Dr. Hasbrook [Doc. No. 24, p. 24, Tr. 844].  Again, this evidence was discussed by the ALJ [Tr. 904] and Plaintiff has failed to specify a particular portion of the record to support her claim that there were "multiple findings not mentioned by the ALJ" which "convincingly

showed" Dr. Hasbrook's opinions regarding maintaining a schedule and regular attendance and completing a normal workday and workweek "to be well founded." [Doc. No. 24, p. 24].

Plaintiff also takes issue with that portion of the ALJ's evaluation of Dr. Hasbrook's opinions where the ALJ repeated Dr. Hasbrook's statement from an October, 2006 progress note that "just because [Plaintiff] has a bipolar diagnosis, it doesn't mean that she is not capable of working." [Doc. No. 24, pp. 21 - 22, Tr. 907, and Tr. 972]. Plaintiff maintains that this was legal error because Dr. Hasbrook went on to say – but the ALJ did not note – that Plaintiff "is going to have to have something maybe parttime and maybe that isn't a food service and people service kind of job. Of course, she's limited because she's in a very small community." [Tr. 972]. Plaintiff acknowledges, however, that the ALJ reproduced Dr. Hasbrook's full notation earlier in her decision [Tr. 904] but did not repeat it when evaluating Dr. Hasbrook's Mental Medical Source Statement [Doc. No. 24, p. 21]. Plaintiff equates this statement with "a limitation to part time work" and further contends that the ALJ failed to evaluate this "opinion." [Doc. No. 24, p. 21]. Nonetheless, even Plaintiff admits that Dr. Hasbrook's memorialization of her conversation with Plaintiff – who was upset because she believed that she had been "turned down by Social Security" because Dr. Hasbrook had, presumably in the July, 2006 Mental Medical Source Statement, suggested that Plaintiff "just didn't have enough gumption to get up and go to work" [Tr. 972][17] – was "equivocal."

_____

[17]Dr. Hasbrook elaborated on the moderate limitations she had assessed by stating that "most of [Plaintiff's] moderate limitations occur in dealing with people in authority, ie. employers. I cannot say that this has anything to do with her mental illness diagnosis or if

(continued...)

The undersigned perceives no error in connection with the ALJ's failure to include and analyze Dr. Hasbrook's complete discussion with her patient in the medical opinion evaluation or in her failure to treat this statement as a limitation by Dr. Hasbrook to part time work.  By quoting Dr. Hasbrook's statement that a bipolar diagnosis did not equate with an inability to work, the ALJ was underscoring the fact that Dr. Hasbrook's own medical source form provided that moderate limitations only affected and did not preclude the ability to perform work functions.  And, there is simply no reasonable indication that it was Dr. Hasbrook's medical opinion that Plaintiff could only perform part time work.  It is reasonable to conclude that if Dr. Hasbrook was of the opinion that Plaintiff could work but that she could only work on a part time basis, she would have voiced that opinion in her Mental Medical Source Statement [Tr. 856 - 859]. The ALJ did not error by failing to evaluate the doctor's notation of her conversation with her patient – candidly construed by Plaintiff as "*suggesting* that work of a part-time and non-food or people service nature would *perhaps* be appropriate" for Plaintiff [Doc. No. 24, p. 21, emphasis added] – as opinion evidence.  In this connection, Plaintiff argues, incorrectly, that it would be "an improper post hoc justification" of the ALJ's decision for the court to find that the ALJ's treatment of Dr. Hasbrook's October, 2006 progress note could be justified "based on the equivocal nature of the language used."  *Id.* at p. 22, p. 10.  As in *Bigpound v. Astrue,* 280 Fed. Appx. 716 (10th Cir. 2008), Plaintiff is complaining of what the ALJ failed to do in reaching her decision

---

[17](...continued)
it is more personality and desire driven." [Tr. 859].

and this court has "simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error. The ALJ was not required to provide grounds in the decision for failing to do what was not required" and this court has not "relied on a substitute rationale for upholding the ALJ's decision." *Id.* at p. 719, n.2.

Plaintiff has failed to establish, as claimed, that the ALJ committed legal error in her evaluation of Dr. Hasbrook's medical opinions.[18]

### RFC Assessment

Here, Plaintiff argues that the RFC assessed by the ALJ is flawed because it does not contain various limitations ascribed by Dr. Hasbrook – maintaining a regular schedule and attendance and completing a normal workday and workweek – and Dr. Rawlings [Doc. No. 24, pp. 26 - 28]. The undersigned has determined that the ALJ did not err in her evaluation of Dr. Hasbrook's opinions or in failing to specifically evaluate Dr. Rawling's controverted opinions from a previously adjudicated period. Accordingly, Plaintiff's corresponding claim that the RFC is flawed because it does not contain the omitted limitations is unavailing.

### Step Five

Plaintiff's final claim is that the ALJ erred by failing to include all of the restrictions contained in the RFC assessment [Tr. 903] in her hypothetical questioning to the vocational

---

[18]The undersigned has not addressed Plaintiff's argument with regard to various GAF scores attributed to Plaintiff [Doc. No. 24, pp. 22 - 23]. The undersigned agrees with Plaintiff's statement that the ALJ's reference to such scores does "not seem[ to be] a part of the ALJ's reasoning for [according little weight] to [certain of] Dr. Hasbrook's opinions[.]" *Id.* at 22.

expert [Doc. No. 24, pp. 28 - 30].  Specifically, Plaintiff argues that in her hypothetical question the ALJ stated that the hypothetical claimant "would require simple one and two step tasks away from the public, and that she would otherwise need to 'work alone' due to an inability to get along and work with others, but never mentioned [the hypothetical claimant's] need for 'work in relative isolation, such as work from home' as stated in her RFC."  *Id.* at 29.  The undersigned finds that the clear – and reasonable – interpretation of Plaintiff's RFC requirement is that Plaintiff work in isolation and that an example – not a qualification – of such work is work that can be performed from her home.  No error was committed by the ALJ in this regard.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be affirmed.  The parties are advised of their right to object to this Report and Recommendation by the 19th day of January, 2012 in accordance with 28 U.S.C. §636 and Fed. R. Civ. P. 72.  The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein.  *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 30th day of December, 2011.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE